UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-20008-CR-LEIBOWITZ(ss)

UNITED STATES OF AMERICA

vs.

MICHAEL KARL GEILENFELD,

    Defendant.
    _____/

UNITED STATES' SECOND SUPPLEMENTAL NOTICE AND
MEMORANDUM IN SUPPORT OF MOTIONS *IN LIMINE* TO ADMIT EVIDENCE
UNDER RULES 413, 414, AND/OR 404(b)

    The United States submits this second supplemental notice and memorandum in support of its previously filed notices and motions *in limine* to admit evidence pursuant to Federal Rules of Evidence 413, 414, and/or 404(b). For the reasons set forth herein, as well as those set forth in the prior filings and at the hearings, the Government submits that the proffered testimony of Victim M, Victim N, Witness 4, and Witness 5 should be ruled admissible.

## BACKGROUND

    At the hearing on December 5, 2024, the Court stated, *inter alia*, that it was reserving a ruling on the admissibility of Victim N and Witness 4 pending further information about these witnesses' proposed testimony. Having reviewed the Defendant's written opposition to the proffered testimony of Witness 5 (ECF No. 40), the Court initially stated that it was going to exclude Witness 5, but upon the Government's request for an opportunity to reply in writing in support of that testimony, the Court granted the Government's request and clarified that the Government could provide additional information about the proposed witnesses who were not yet ruled admissible, for resolution at the January 7, 2025, hearing.

Accordingly, the Government now provides additional factual information about the scope of these witnesses' expected testimony and responds to the arguments made in the Defendant's written opposition.[1]

## ADDITIONAL DISCLOSURE & ARGUMENT

### Victim N

As summarized in the Government's original 404(b)/413/414 notice, "Victim N met the defendant in the early 1980s and was repeatedly sexually abused by him in Haiti and in the United States, when Victim N was approximately 9 to 14 years old. The abuse included oral and anal penetration and threats of harm if Victim N disclosed the abuse." ECF No. 37, at 12.

The discovery provided to the defendant in April 2024 included, *inter alia*, a transcript (Bates 1639-1857) and detailed report (Bates 110-121) of the interview of Victim N by Homeland Security Investigations, which elaborated on the sexual abuse and the relationship between Victim N and the Defendant. Of particular note, Victim N reported then, and is expected to testify at trial, that he met the Defendant in 1981, soon after the Defendant had arrived in Haiti as a missionary; Victim N's older brother was working for the Defendant (teaching him Creole), and Victim N followed his brother to the Defendant's house, where the Defendant gave him candy and iced tea. The Defendant was building a new house for "street children" to live at, and Victim N eventually asked if he could also stay at that house and go to school. Victim N was approximately 9 years old at the time he began living at the Defendant's house with other children (though the Defendant

---

[1] The Government is no longer seeking to call Victim E. The Government has not been able to speak with Victim G, despite extensive efforts, and thus it is not in a position to provide additional factual information about what he may testify to if he were to appear for trial. With respect to Victim M, for whom the Court stated it had not formed a view as to admissibility, the Government provides some additional detail at the end of this memorandum and reaffirms its position that his testimony is admissible.

2

later got papers for Victim N that listed his birth year as seven years earlier than his true birth date).

The first instance of sexual abuse that Victim N remembers is when he (Victim N) was sleeping in the hallway area on a mattress; the Defendant woke Victim N and led him to the office. The Defendant told Victim N that he (the Defendant) could provide Victim N with various items, and Victim N thanked him, not realizing what the Defendant was intending. The Defendant then told Victim N to take off his (i.e., Victim N's) clothes. Victim N refused, and the Defendant said words to the effect of, "do you know what can happen to you?" The Defendant then put Victim N's penis in his mouth and "started sucking it." Similar instances of oral penetration occurred over the next couple of years, as well as anal penetration.

Once the Defendant began sexually abusing Victim N, the Defendant started giving Victim N better clothes than other children and additional money. The Defendant also took Victim N to the United States, including to Algona, Iowa, where the Defendant's family home and parents were. In Algona, Victim N was able to attend high school; however, the Defendant continued to sexually abuse him, including in the house in Algona. Victim N returned to Haiti around 1986.[2]

Victim N was reluctant to report the sexual abuse because of a combination of factors including shame, fear, and threats (e.g., the Defendant's taunting question "who will believe a black little kid?"). Even after Victim N disclosed the abuse, he sometimes denied it to certain people.[3] Victim N feels guilty about not having more promptly and consistently disclosed the abuse.

---

[2] Victim N later traveled back to the United States, stayed in the United States for an extended period of time (overstaying a visa), and was ultimately deported back to Haiti.

[3] For example, around 2011 and 2014 Victim N disclaimed having been sexually abused by the Defendant. Among the reasons for Victim N's denials were statements that the Defendant made to Victim N, which Victim N perceived as threats to the safety and security of Victim N's

The Government respectfully submits that this supplemental disclosure should satisfy the Court's concern that it had insufficient facts on which to rule Victim N's proffered testimony admissible. As with the uncharged victims whom the Court has already ruled may testify, the Government will include in its proposed jury instructions the limiting instructions so that such testimony is only considered for its proper purposes under Rules 404(b), 413, and 414. And as previously noted, the Government will continue to assess up through each day of trial which uncharged victims to ultimately call, considering such factors as which victims/witnesses have already testified, what they testified about, and who is actually available in the United States to testify, so that testimony does not become cumulative or unfairly prejudicial.

<u>Witness 4</u>

At the December 5, 2024, hearing, the Court stated that it needed more information about the time frame when Witness 4 observed the Defendant's "change in demeanor" described in the Government's supplemental notice (ECF No. 47, at 2). The Court also stated that it needed more information about the time frame when Victim L disclosed being sexually abused to Witness 4 and about why such a statement would not be inadmissible hearsay. The Government thus provides that information and proffers additional facts:

In 1987, while the Defendant was on tour in the United States with his Haitian dance troupe comprised of SJF residents, the Defendant visited Witness 4 at her school in Boston, MA. During their trip, she learned that some of the boys disclosed sexual abuse by the Defendant, and Witness 4 went to see the Defendant in person. This is when Witness 4 observed the "drastic and 'scary'

---

family (e.g., questioning whether he loved his kids and instructing him to "do it [recant/deny] for your kids").

4

change in the Defendant's demeanor" described in the notice; the Defendant became very upset and angry and accused Witness 4 of believing the allegations.

Witness 4's firsthand, eyewitness observation of the Defendant's response to boys' reports of his sexual abuse is not "vague, speculative, and unfairly prejudicial," as the Defendant contends (*see* ECF No. 52, at 4-5). Rather, it is a specific, concrete example that evinces the Defendant's state of mind, plan, and modus operandi for the charged crimes—alternately portraying himself as a gentle savior for troubled children and employing scare tactics against anyone who dared to challenge that façade, so that he could continue his access to and abuse of Haitian children. That this incident occurred before the charged time period should not render it inadmissible; indeed, the Court has already recognized that testimony about the Defendant's sexual abuse of children in the 1980s-1990s is admissible. *See, e.g.*, ECF No. 49, at 2 (holding that the proffered testimony of Victims H, I, J, and K is admissible); ECF No. 37, at 9-11 (setting forth the time frame of those victims' abuse). It satisfies the requirements of Rules 404(b) and 403.

As for the timing of Victim L's disclosure to Witness 4 of being sexually abused by the Defendant, Witness 4 recalls that Victim L initially disclosed to her approximately 10-15 years ago, that he reaffirmed having been victimized in subsequent calls they had over the course of multiple years, and that in approximately the past year he provided more specific details to her. The Government is, of course, aware of the rule against hearsay, and would only seek to introduce such a statement if proper under the rules of evidence—most likely if the defense were to attack the credibility and truth of Victim L's expected testimony. *See, e.g.*, Fed. R. Evid. 801(d)(1)(B) (providing that "a statement consistent with the declarant's testimony" that is offered "(i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a

5

witness when attacked on another ground," is not hearsay); *United States v. Graham*, --F.4th--, 2024 WL 4929254, at *17-18 (11th Cir. Dec. 2, 2024) (affirming admission of prior consistent statement under Rule 801(d)(1)(B)(i)); *United States v. Purcell*, 967 F.3d 159, 195-98 (2d Cir. 2020) (affirming admission of victim's prior consistent statement to law enforcement after defense counsel highlighted inconsistencies between the victim's prior statements and her trial testimony).[4]

More generally, having testimony from Witness 4 about her observations—especially the Defendant's violence and punishment of child residents, and the Defendant's access to a young male resident in a locked bedroom, as set forth in ECF No. 47[5]—is highly probative and important. Most notably, it shows the Defendant's opportunity, plan, and modus operandi to commit the charged crimes—having unsupervised access to boys at SJHB and creating an environment where the children could not resist his sexual advances or disclose the sexual abuse. And Eleventh Circuit law makes clear that (1) a witness need not have observed the actual sexual activity; (2) the incident need not involve a charged victim (or even a minor); and (3) evidence of physical abuse is admissible. *See, e.g.*, *United States v. Kapordelis*, 569 F.3d 1291, 1302, 1312-14 (11th Cir. 2009) (affirming under Rule 404(b) the admission of one eyewitness's testimony that he saw the defendant give a teenager, who may have been 18 years old, money after bringing the teenager back to a hotel room, and of another eyewitness's testimony that he saw the defendant put "money in front of a boy until the boy agreed to leave with him"; neither involved a charged victim); *United*

---

[4] Additionally, Minor 4 disclosed to Witness 4 within approximately the past 3 years that the Defendant sexually abused him (i.e., Minor 4). Such testimony, involving a charged victim, is not "other acts" evidence.

[5] In a January 5, 2025, follow-up interview, Witness 4 clarified that while she does not know how old the young male resident was at the time, she believes he was at least 18 years old. She also explained that the reason she was looking for the Defendant was because they had been planning to watch a movie, and she was thus surprised when she found him in a darkened, locked bedroom with the young resident and when the young resident did not stay to watch the movie the Defendant claimed they had been watching but instead left the room promptly upon her arrival.

6

*States v. Doak*, 47 F.4th 1340, 1359 (11th Cir. 2022) (affirming admission of video showing the defendant slapping the § 2423 victims' sibling, explaining that "[t]he combination of threats and physical abuse the adopted children suffered at the hands of the defendants was 'an integral and natural part of an account of the crime' and were 'necessary to complete the story of the crime for the jury'"); *see also United States v. Garcia*, 148 F. App'x 594, 595 (9th Cir. 2005) ("The evidence of physical abuse was properly admitted [under Rule 404(b)] to show why the girls did not report the [sexual] abuse right away.").

Moreover, eliciting this testimony from Witness 4—an American educator and NGO worker—is particularly important because the eyewitnesses whom the Court has already ruled admissible (Witnesses 1-3) are former SJHB residents who still reside in Haiti and thus (1) may have difficulty ultimately getting to the United States for trial, and (2) are expected to be subjected to questions about their motivations for testifying that would not apply to Witness 4. Finally, limiting instructions can further eliminate any residual concerns about the testimony. Witness 4's testimony should be deemed admissible.

<u>Witness 5</u>

As summarized in the Government's supplemental notice, "Witness 5 is an American who visited SJHB as a volunteer in 1991 and 1992. While at SJHB, Witness 5 observed a boy, approximately 8-10 years of age, exit a room, followed immediately by the Defendant. While the boy exited the room, he was looking down at his pants and buttoning them up." ECF No. 47, at 3.

The discovery provided to the Defendant in July 2024 included, *inter alia*, a more detailed report of the interview (ROI) of Witness 5 conducted by FBI (Bates 19047), and on January 3, 2025, the Government spoke further with Witness 5. Of particular note, Witness 5 reported, and is expected to testify, that she traveled to Haiti in July 1991 to volunteer with another missionary

7

organization (referred to herein as "Missionary Organization X"), run by "Father V" and "Sister W"; Father V and the Defendant were friends.[6] Witness 5 returned to the United States in October 1991, due to the coup d'etat in Haiti, but returned to Haiti in January 1992 and continued to volunteer with Missionary Organization X until July 1992. During her time in Haiti, Witness 5 also volunteered with another missionary organization where boys from SJHB volunteered.

On one occasion during her time in Haiti between January and July 1992 (a more precise date she does not remember), Witness 5 went with Father V and Sister W to have dinner with the Defendant at SJHB. SJHB had multiple levels, including a balcony. During the evening, Witness 5 ended up alone on the balcony. While alone near a corner of the balcony, Witness 5 observed a young boy exit one of the rooms while buttoning up his pants; very soon thereafter (within no more than a minute), the Defendant came out of the same room and shut the door behind him. Neither the Defendant nor the young boy (whom Witness 5 believed to be between 8-10 years old, considering his small size and stature) saw Witness 5, as Witness 5 was off toward the corner and their backs were toward her as they left and seemed headed downstairs.

Witness 5 was concerned about what she observed, especially because boys from SJHB had previously mentioned (in Creole, a language in which Witness 5 was fluent) that the Defendant—who provided food and shelter to the SJHB boys—fondled and "touched the pee-pee" of boys at SJHB and had used the term "masisi" (the Creole word for "homosexual") when discussing the Defendant.[7] Witness 5 therefore reported her observation to Father V, whom she

---

[6] The true names of the organization and its leaders are disclosed in the ROI and would be referenced at trial.

[7] The statements to Witness 5 by the SJHB boys would not be offered for the truth of the matter asserted, but rather to show the effect on the listener—i.e., to explain why Witness 5 took the steps she did. The Government would propose a limiting instruction so the jury understands the limited purpose for which those statements are being admitted.

8

believed at the time was in the best position to address her concern; she did not report to other authorities (e.g., the police), given the political/social instability in Haiti.

The Government submits that, with this additional detail, the proposed testimony of Witness 5 is not "so vague" that wholescale exclusion is warranted, as the Defendant previously asserted. *See* ECF No. 52, at 5 (requesting "more information" so that the Defendant could "address it"). To the contrary, the proffer provides sufficient facts for a jury to consider the Defendant's opportunity, plan, and modus operandi to commit the charged crimes—having unsupervised access to boys at SJHB whom he could touch unclothed and otherwise sexually abuse. Of course, the defense is free to cross examine Witness 5 and make argument to the jury about the import—or lack thereof—of her observation, including that she did not see the Defendant actually molesting the boy. However, observations like that of Witness 5 are as close to a smoking gun as can be expected from an eyewitness in this case, considering that sexual abuse by its nature tends to occur in private. And as noted above, Eleventh Circuit law makes clear that (1) a witness need not have observed the actual sexual activity and (2) the incident need not involve a charged victim, in order for the testimony to be admissible. *See supra* (citing *Kapordelis*, 569 F.3d at 1302, 1312-14).

Moreover, having eyewitness testimony from Witness 5—an American living in the United States—is particularly probative and important because the eyewitnesses whom the Court has already ruled admissible (Witnesses 1-3) are former SJHB residents still residing in Haiti, who as explained above (1) may have difficulty ultimately getting to the United States for trial, and (2) are expected to be subjected to questions about their motivations for testifying that would not apply to Witness 5.

9

In sum, the proffer provides sufficient facts for the Defendant to prepare his defense, and it is ultimately for the jury to decide the significance of the facts presented to it and how much weight (if any) to grant them. Moreover, limiting instructions can further eliminate any residual concerns about the testimony. The proffered testimony satisfies Rules 404(b) and 403 and should be admitted.[8]

Victim M

As summarized in the Government's original 404(b)/413/414 notice, "Victim M lived with the defendant at SJHB from approximately 1986 until 1995 when he was between 10 and 19 years old. Victim M is expected to testify that the defendant touched his penis and tried to engage in additional sexual activity with him, but Victim M told the defendant that his back hurt so he would leave him alone. Victim M reported that the defendant hit him and on one occasion put Victim M's neck between the defendant's legs and hit the back of Victim M's neck with his hand." ECF No. 37, at 11-12.

The discovery provided to the defendant in April 2024 included, *inter alia*, a transcript (Bates 5131-5173) of Victim M's prior testimony about his relationship with the Defendant and the sexual abuse he suffered at the Defendant's hands. Among the additional details provided

---

[8] In a similar vein, the Government intends to elicit eyewitness observations of the Defendant touching a charged victim in a manner that is not itself a federal crime but that is part and parcel of the Defendant's grooming and sexual abuse of the charged victim. More specifically, the Government intends to call Witness 6 to testify about his observation of the Defendant kissing Victim 5 at the house where they were residing when Victim 5 was 16 years old (i.e., around 2009, during the time period in which the Defendant is charged with sexually abusing Victim 5). The Government believes that such evidence is inextricably intertwined with the charged abuse in Count 6 and forms part of the *res gestae*, such that notice and analysis under Rules 404(b), 413, and/or 414 is not required. The Government nonetheless mentions this expected testimony here, in an abundance of caution and without prejudice to eliciting other evidence that is inextricably intertwined with the charged offenses, and notes that further details about Witness 6's observations concerning Victim 5 are available in the ROI for Witness 6 (Bates 16796-16800).

there, and to which the Government expects Victim M would testify at trial, are that the Defendant called him to the Defendant's bedroom, where the Defendant showed him money, candy, and other items, and told him he needed to "make a sacrifice"—which meant spending time in the Defendant's bed—if Victim M wanted those items or to travel.  On one occasion when Victim M was 10 years old and laying on his back in bed, the Defendant unzipped Victim M's pants, touched Victim M's penis, and kept telling Victim M to turn over so that the Defendant could anally penetrate him; Victim M refused, complaining that his stomach hurt, and made noise, such that the Defendant ultimately left without having anally penetrated Victim M.

      The Defendant's only argument directed at Victim M's testimony was that the alleged abuse "occurred approximately ten years before" the charged conduct.  ECF No. 40, at 4.  But as the Court subsequently explained, considering the clear precedential case law and the facts of this case, uncharged conduct from the 1980s and 1990s should not be excluded just because it occurred a decade or more before the charged abuse.  *See supra*.  Moreover, as with the uncharged victims whom the Court has already ruled may testify, the Government will include in its proposed jury instructions the limiting instructions so that such testimony is only considered for its proper purposes under Rules 404(b), 413, and 414.  And the Government reaffirms that it will continue to assess up through each day of trial which uncharged victims to ultimately call, considering such factors as which victims/witnesses have already testified, what they testified about, and who is actually available in the United States to testify, so that testimony does not become cumulative or unfairly prejudicial.  Accordingly, the Government submits that the testimony of Victim M should be deemed admissible should the Government choose to call him at trial.

**CONCLUSION**

For the reasons set forth in this and the United States' prior filings, as well as for the reasons further set forth at the hearings on this matter, the United States respectfully requests that the Court rule the proffered evidence admissible.

        Respectfully submitted,

        MARKENZY LAPOINTE
        UNITED STATES ATTORNEY

By:    */s/ Lacee Elizabeth Monk*
        Lacee Elizabeth Monk
        Assistant United States Attorney
        Florida Bar No.100322
        99 NE 4th Street
        Miami, Florida 33132-2111
        Phone: (305) 961-9427
        Email: Lacee.Monk@usdoj.gov

        */s/ Jessica L. Urban*
        Jessica L. Urban
        Florida Special Bar ID No. A5503222
        Trial Attorney
        Child Exploitation and Obscenity Section
        Criminal Division
        U.S. Department of Justice
        1301 New York Avenue NW
        Washington, DC 20005
        Phone: (202) 353-4146
        Jessica.Urban@usdoj.gov

        */s/ Eduardo Palomo*
        Eduardo Palomo
        Florida Special Bar ID No. A5503186
        Trial Attorney
        Child Exploitation and Obscenity Section
        Criminal Division
        U.S. Department of Justice
        1301 New York Avenue NW
        Washington, DC 20005
        Phone: (202) 305-9635
        Eduardo.Palomo2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2025, I filed this document electronically using the CM/ECF system and thereby caused a copy of the same to be served on all counsel of record.

*/s/ Jessica L. Urban*
Jessica L. Urban
Trial Attorney